**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 1:25-CR-00042** |
| **Plaintiff,** | |
| **-vs-** | |
| | **JUDGE PAMELA A. BARKER** |
| **JESSE MELTON,** | |
| **Defendant.** | **MEMORANDUM OPINION & ORDER** |

This matter is before the Court upon Defendant Jesse Melton's ("Defendant" or "Melton") Motion to Suppress Evidence filed on December 22, 2025 ("Defendant's Motion"). (Doc. No. 52.) On January 5, 2026, the United States of America filed the Government's Response in Opposition to Defendant's Motion ("the Government's Response"). (Doc. No. 56.) On January 8, 2026, Melton filed a Reply in Support of Defendant's Motion ("Defendant's Reply"). (Doc. No. 58.)

On January 16, 2026, a hearing was held on Defendant's Motion and at the conclusion of the hearing the Court advised the parties that it would take the matter under advisement. Then, on January 20, 2026, Melton filed a Motion for Leave to File Post-Hearing Supplemental Brief, the Government opposed it, and Melton filed a reply in support. (Doc. Nos. 62, 63, 64.) During a hearing conducted on January 28, 2026, the Court granted Melton's Motion for Leave to File Post-Hearing Supplemental Brief and granted Melton's request that the transcript of the hearing be provided to him at the Government's expense. The parties were ordered to file their supplemental briefs within 14 days of the filing of a notice by the Courtroom Deputy of receiving email confirmation of Melton's receipt of the transcript. Such notice was filed on March 2, 2026. Then, on March 5, 2026, Melton filed a motion for a 14-day extension of time to file his post-hearing supplemental brief and at a status

conference conducted on March 10, 2026, the Court granted the parties leave to file their supplemental briefs up to and including March 30, 2026. (Doc. No. 72.) The Government filed its Supplemental Brief on March 23, 2026. (Doc. No. 79.) But on March 30, 2026, Melton requested another extension of time within which to file his supplemental brief, which was granted. (Doc. No. 80.) On April 6, 2026, Melton filed his Post-Hearing Supplemental Brief, and then on April 8, 2026, Melton filed his Amended Motion to Suppress. (Doc. Nos. 81, 82.)

For purposes of this Memorandum Opinion and Order, the original Motion filed by Defendant on December 22, 2025, Melton's Reply filed on January 8, 2026 and the Amended Motion to Suppress filed by Defendant on April 8, 2026 together are hereinafter referred to and considered as "the Motion" (Doc. Nos. 52, 58, and 82); and the Government's Response filed on January 5, 2026 and the Government's Supplemental Brief filed on March 23, 2026 together are hereinafter referred to and considered as "the Government's Opposition." (Doc. Nos. 56 and 79.)

For the reasons set forth below, Defendant's Motion is DENIED.

**Evidence adduced at the hearing**

At the hearing conducted on January 16, 2026, the three witnesses that testified were patrolmen with the Euclid Police Department who responded to an 8:08 p.m. call from Dispatch on December 13, 2024 about a white SUV ("the vehicle") stopped in the middle of the roadway on Lakeland Boulevard near East 260th Street in Euclid, Ohio ("the incident").

The first and only witness called by the Government was Patrolman Michael Green ("Officer Green"). During his testimony, Officer Green was shown his body camera footage associated with

the incident,[1] a copy of the Euclid Police Department's Policy 502 Vehicle Towing and Release Policy, specifically Section 502.4 Towing At Arrest Scenes in effect at the time of the incident ("the Policy"),[2] and the CAD sheet, Number 2024648279 associated with the incident ("the CAD sheet").[3] Officer Green's testimony and these exhibits demonstrate the following.

Officer Green arrived at the scene of the incident and positioned his police cruiser in front of the vehicle with its oscillating blue lights activated, meaning that they would shine directly in the operator's face. It had been reported by Dispatch that the operator was not moving and therefore, Officer Green suspected that it could have been a situation involving either an OVI or some type of medical emergency.  He was concerned for the safety of the operator and other motorists on the roadway because if the operator was awakened while the vehicle was in drive, the operator might

---

[1] Patrolman Green's body camera footage was marked and introduced as the Government's Exhibit 1 and admitted into evidence.

[2] The Policy was marked and introduced as the Government's Exhibit 2, was admitted into evidence and reads as follows:
**502.4 TOWING AT ARREST SCENES**
Whenever a person in charge or in control of a vehicle is arrested, it is the policy of this department to provide reasonable safekeeping by towing the arrestee's vehicle subject to the exceptions described below. However, a vehicle shall be towed whenever it is needed for the furtherance of an investigation or prosecution of the case, or when the community caretaker doctrine would reasonably suggest that the vehicle should be towed. For example, a vehicle shall be towed if it would present a traffic hazard or if it would be in jeopardy of theft or damage if left at the scene in a high-crime area.
The following are examples of situations where consideration should be given to leaving a vehicle at the scene in lieu of towing, provided the vehicle can be lawfully parked and left in a reasonably secured and safe condition:
• Traffic-related warrant arrest
• Situations where the vehicle was not used to further the offense for which the occupant was arrested or is not subject to forfeiture proceedings
• Whenever the vehicle otherwise does not need to be stored and the owner requests that it be left at the scene
In such cases, the handling employee shall note in the report that the owner was informed that the Department will not be responsible for theft or damages.

[3] Patrolman Green testified that the CAD sheet is the printout of how and when the call came into Dispatch concerning the white SUV stopped in the roadway and it was marked and introduced as the Government's Exhibit 3 and admitted into evidence.  The CAD sheet identifies the "Call Type" as "WELFCHECK" and includes a Narrative which reads in relevant part as follows: "CALLER REPORTING A WHITE SUV POSSIBLY A CADILLAC WITH SOMEONE SLUMPED OVER IN THE DRIVER SEAT IN THE LEFT TURNING LANE.  CALLER WAS A PASSERBY."

3

step on the gas.  The vehicle was stopped facing eastbound on Lakeland Boulevard in the left-hand turning lane.  Traffic was going by during the time that Officer Green was present at the scene and there would have been multiple cycles of the light turning green for the vehicle to proceed between the time that elapsed between the Dispatch call coming in and Officer Green arriving at the scene of the incident.

Officer Green exited his patrol car and proceeded to the rear of the white SUV and called in the license plate number of the vehicle.  He learned that the vehicle was registered to Jesse Melton who had a probation violation warrant associated with a weapons charge out of Virginia.  Officer Green became aware of the following traffic infractions:  impeding the flow of traffic; and display of plates, meaning that the rear license pate could not be seen from 50 feet away because the plate was in the rear windshield on the upper left-hand corner of the inside of the vehicle obstructed by the rear windshield tint.  Officer Green noticed that the red lights on the vehicle were on, meaning that the operator's foot was on the brake.

Based upon his training and experience, when a registered owner of a vehicle has an outstanding warrant and the single occupant of the vehicle is the driver, Officer Green suspects that the driver is the registered owner of the vehicle.  Officer Green observed the driver inside the vehicle with his head slumped over and his eyes closed.  He suspected that the driver was either having some type of medical emergency or was under the influence of alcohol or a drug.

Patrolmen Justin Deltour ("Officer Deltour") and Timothy Ramos ("Officer Ramos") arrived at the scene of the incident.  Officer Deltour had parked directly behind Melton's vehicle, and he approached the vehicle on the passenger side.  According to Officer Green, the purpose of Officer Deltour opening the passenger side door was to try and put the vehicle in park so as to prevent a

4

disoriented sleeping driver from awakening and accelerating; it was to make the situation safe.  The officers looked in the vehicle using flashlights and according to Officer Green, they did so to see if there were any weapons inside that were within reach of the driver.  The driver had his head down and his eyes closed.  Officer Green woke the driver up by tapping on the window and asked the driver to roll down his window which he did partway, shut off the vehicle, and unlock the doors and step out of the vehicle.  The driver did not ask Officer Green to open the door and did not give consent to Officer Green to his door being opened.  Prior to opening the driver's door once it was unlocked, Officer Green had not asked the driver any medical questions concerning his welfare, had not smelled alcohol, had not seen any guns or drugs in the vehicle and had not asked the driver for his name or driver's license or confirmed the warrant.  Officer Green took the driver's arm to help get him out of the vehicle, asked him what was going on and if he was alright, asked him to turn towards the vehicle so he could make sure he had nothing on him that could hurt the officers, patted him down, shut the driver's door and then, asked the driver his name.  The driver stated his name was Jesse Melton.  Then, Officer Green learned through Dispatch that Melton had a U.S. Marshals Task Force warrant and so he handcuffed Melton and walked him to Officer Deltour's cruiser.  Officer Green performed a quick pat down of Melton and then placed him in the back seat of Officer Deltour's cruiser.  Then, officers began searching the vehicle.

According to Officer Green, the intent at that time was to tow Melton's vehicle to prevent it from continuing to impede the flow of traffic.  Officer Green testified that according to the Policy, when an operator of a vehicle is arrested and there is no other licensed operator who can move the vehicle with the consent of the registered owner, then the vehicle is towed.  Since there was no other licensed operator in Melton's vehicle, the Policy required towing the vehicle.

5

According to Officer Green, Dispatch described the call that Officer Green received as a welfare concern and someone slumped at a wheel, but the crime would have been a traffic infraction for standing or impeding traffic.  He did not cite Melton for any traffic violation but just advised on the traffic infraction, thinking that the arrest on the warrant as well as the items that were discovered inside the vehicle were sufficient. When the doors of Melton's vehicle unlocked – whether automatically when the vehicle was shut off, or not – Officer Green opened the driver's door even though Melton had not consented to it being opened.  Prior to opening the driver's door and as of the time that Officer Deltour stated, "are you ready to go now, let's try and wake him up, get him to unlock it," Officer Green had not smelled any alcohol, seen any guns or drugs, or confirmed the warrant.  After Melton had rolled down the window partway and the car was turned off, Officer Green did not ask the driver to identify himself or to provide his driver's license and did not ask any questions to satisfy his concerns about Melton experiencing a medical emergency or being impaired. Officer Green testified that he could have assessed the driver's impairment through the open window without removing him from the vehicle but later added that he would be better able to detect the odor of alcohol or marijuana if the driver was outside of the vehicle and he was speaking to him.  Officer Green testified that once Melton was removed from his vehicle and patted down, with no weapons found, and the doors to the vehicle had been closed and the engine turned off and Melton was separated from his vehicle, there was no immediate officer safety concern related to the vehicle. Officer Green remembered, and his body camera captured, Officer Deltour inquiring of Melton about his welfare, Melton being questioned about where he was coming from and going to, and Melton being asked for his social security number before Officer Deltour returned to his vehicle to provide that information to Dispatch.

6

According to Officer Green, Melton was detained from the moment the officers arrived at the incident scene.  Officer Green confirmed that Melton was arrested because of the outstanding Marshals warrant and at the time when Melton was arrested because of the warrant, there would have been no need to search the vehicle.  Officer Green testified that a tow was called for Melton's vehicle because it was parked in the middle of the roadway and there was no other valid driver inside the vehicle, consistent with the Policy's preferred course of action.  The vehicle needed to be moved because there was ongoing traffic trying to turn left at the intersection.  Officer Green remembered only one time during his approximate two and one-half years as a patrolman with the City of Euclid where he did not implement this preferred course of action.  Specifically, after a vehicle had been pulled over in a parking lot and the operator had asked that his car be parked in the lot, Officer Green had agreed to that request, and had parked the vehicle, locked it, and left it in the parking lot.  Melton did not make a request to Officer Green that his car not be stored or towed, and Officer Green did not have a discussion with Melton concerning any alternative to towing his vehicle.  According to Officer Green, the decision to tow the car was made after the warrant was confirmed.

Melton called Officer Deltour as his first witness.  Officer Deltour's testimony and his body camera footage associated with the incident,[4] demonstrate the following.  He was the second patrolman to arrive at the scene of the incident and he placed his cruiser directly behind Melton's vehicle after asking a motorist stopped directly behind Melton's vehicle to move.  He talked with other officers on the scene generally about making a plan to wake up Melton in a safe manner.  As demonstrated by his body camera footage, Officer Deltour was aware of the report of an outstanding

---

[4] Officer Deltour's body camera footage was marked and introduced as Defendant's Exhibit A and was admitted into evidence.

warrant for the registered owner of the vehicle  and stated to Officer Ramos, "hopefully, we can get him on a warrant," meaning that when officers come across someone sleeping at the wheel, the driver is usually intoxicated so it makes things easier to arrest the driver on the warrant and not proceed with the OVI.  Then, Officer Deltour approached the vehicle.  Officer Deltour said to Officer Green that the driver was sleeping.  It appeared to Officer Deltour that the driver was unconscious, and he could not say if the driver was having a medical emergency. After saying "wake up" and tapping on the passenger window and asking the driver to roll down his window, turn the vehicle off, unlock the doors, Officer Deltour opened the passenger door and ordered Melton to give him the keys and then took them from the ignition.  Officer Deltour heard the doors to the vehicle unlock and then opened the passenger side door and as of that moment, he had not seen a gun or anything in plain view in the vehicle.  Officer Deltour opened the passenger door of the vehicle for officer safety.  He reached into the vehicle, put the vehicle in park and grabbed the keys from the ignition.  Melton did not give his consent to Deltour opening the passenger door and grabbing the keys.  At that time, Officer Deltour had knowledge that based upon the license plate number, the registered owner of the vehicle had an outstanding warrant.  Officer Deltour went into the vehicle to perform a protective sweep of it, and did not find anything but he did pick up the driver's phone that had been dropped.   Melton did not ask him to pick up the phone.

When Officer Deltour obtained Melton's social security number from him, he then went to his cruiser and ran it through their data system. At 8:20:47, Dispatch confirmed the outstanding U.S. Marshals Task Force Warrant for Melton and 5 seconds later Officer Deltour acknowledged or confirmed what Dispatch had reported about the Warrant and Officer Deltour called for a tow and prepared a tow form.  Officer Deltour never had a conversation with Melton about considering

alternatives to impoundment or tow of the vehicle and never discussed with other officers on the scene whether the vehicle should be towed.  So, it was Officer Deltour who made the decision to tow the vehicle.  According to Officer Deltour, the Policy reads that "you shall" and not "you should" tow the vehicle when there is an arrest of the driver, but the officer does have some discretion if there is a close family member present or if the driver requested it to be moved to a parking lot.  But Officer Deltour decided to have it towed because Melton was under arrest, and his vehicle was occupying the roadway, and it was a hazard.  According to the Policy, in a situation where the vehicle is blocking traffic, i.e., creating a hazard, the vehicle must be removed.  The "exceptions" to the Policy only apply if the vehicle can be lawfully parked and left in a reasonably secured and safe condition.  Since other officers on scene would have had to leave their cruisers blocking the flow of traffic to move Melton's vehicle and there was nobody else on scene that could have moved Melton's vehicle, the towing of Melton's vehicle complied with the Policy.

Officer Deltour did not consider allowing Melton to have a family member with a valid driver's license "on standby" or five to ten minutes away come and pick up the vehicle.  Where a vehicle is blocking traffic, Officer Deltour has allowed a third party to come and pick up the vehicle with the registered owner's consent but only rarely, and only in the circumstance where the third party arrived within five to ten minutes.  Officer Deltour never offered Melton that option and Melton never asked Officer Deltour if someone else could come and pick up his vehicle.  According to Officer Deltour, Melton's vehicle was being searched by other officers while he was completing the inventory because those tasks are completed at the same time.

9

The second witness called by Melton was Officer Ramos who was the third officer to arrive at the scene. During his testimony, Officer Ramos was shown his body camera footage,[5] as well as that of Officer Deltour. Upon arrival, he observed that Melton's vehicle was blocked in, he spoke with the other two officers, and they walked around Melton's vehicle and checked for any obvious safety concerns inside the vehicle and then began trying to contact the driver. The safety concern he saw was the vehicle in drive and Melton asleep at the wheel. According to Officer Ramos, Melton could have started driving away and hit another car. The blocking of Melton's vehicle was for Melton's safety as well as the safety of the public, i.e., everyone's safety. When Melton exited the vehicle, Officer Ramos did not recall hearing any slurred speech or smelling an odor of alcohol. Officer Ramos did not see any drugs in plain view. He could see that Melton's eyes were closed, he was breathing and apparently asleep and not reacting to any of the multiple stimuli around him that Officer Ramos would expect a person to react to, but not in dire need of medical assistance requiring him to break the window and pull the driver from the vehicle. When asked where he had been, Melton replied "out in Euclid." Officer Ramos did not have any conversations with Melton about alternatives to towing Melton's vehicle. Officer Ramos was the first to start searching Melton's vehicle, and the search of the vehicle and the completion of the inventory by Officer Deltour was a team effort, something completed at the same time or contemporaneously. According to Officer Deltour, Melton was detained once the warrant was confirmed and he was handcuffed, but he was detained initially for a different reason.

**The parties' arguments**

---

[5] Officer Ramos's body camera footage was marked and introduced as Defendant's Exhibit B and admitted into evidence.

Melton argues that he was the subject of an unlawful seizure under the Fourth Amendment the moment that Officers Green and Deltour parked their cruisers in front of, and behind, Melton's vehicle, thereby blocking his vehicle in.  According to Melton, at that time officers did not have reasonable suspicion to justify their non-consensual seizure because there was no medical emergency, and officers had not yet confirmed the warrant.  Melton also argues that opening the driver and passenger doors of his vehicle constituted an independent unlawful search because there was no reasonable basis for the officers to believe a medical emergency existed and the officers had no consent from him to do so or confirmation of his identity or the warrant.  Finally, Melton argues that the decision to tow his vehicle was not mandatory and he was not provided with the opportunity to have a third-party come to the scene and drive the vehicle away.  Melton points to the fact that only five to six seconds elapsed between Officer Deltour's confirmation of the warrant and his ordering of the tow, meaning Officer Deltour exercised no discretion.  Melton asserts that the inventory search of his vehicle began five or six minutes before Officer Deltour completed the inventory paperwork. All told, Melton argues that the decision to tow was a pretext for searching his vehicle which resulted in locating the gun and drugs that are the subject of the Indictment.  According to Melton, then, the gun and drugs must be suppressed as fruit of the poisonous tree.

The Government's response to Melton's argument that the blocking in or seizing of his vehicle was a violation of his Fourth Amendment right to be free from seizure or unlawful, is that the officers were justified in blocking and entering Melton's vehicle because of the Emergency Aid Exception and the officers could investigate Melton's vehicle because they had reasonable suspicion of occurring traffic violations, an OVI, and a possible warrant.  Finally, the Government argues that the

11

officers were justified in towing Melton's vehicle after arresting him on the outstanding warrant because they could not move Defendant's car without risking others in the roadway.

**Law and Analysis**

**<u>The stop and seizure of Melton did not violate the Fourth Amendment since the officers performed community caretaking functions initially, and Melton's stopped vehicle constituted a traffic violation that along with the officers' knowledge of a probation violation warrant associated with a weapons charge for the registered owner of the vehicle, provided the officers with justification to open the vehicle doors, help remove Melton from the vehicle and further investigate to confirm the warrant</u>**

The Fourth Amendment protects the "right of the people to be secure in their persons, papers, and objects, against unreasonable searches and seizures." U.S. Const. amend. IV. *Caniglia v. Strom*, 593 U.S. 194, 198-99, 141 S. Ct. 1506, 1599, 209 L.Ed.2d 604 (2021). "Before entering private property, officers customarily must obtain a valid warrant to ensure that any search and seizure is not 'unreasonable.'" *United States v. Morgan*, 71 F.4th 540, 543 (6th Cir. 2023) (citing *Caniglia v. Strom*, 593 U.S. 194, (2021)). On a suppression motion, the burden of proof or persuasion rests with the party seeking to suppress the evidence. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) (citing *Simmons v. United States*, 390 U.S. 377, 389-90 (1968).

Some exceptions to the search of an automobile without a warrant exist, to include if officers have probable cause to believe it contains evidence of a crime or the driver violated a traffic law or if officers are performing or are involved in a "community caretaker" function. *Morgan*, 71 F.4th at 543-44. The Supreme Court has acknowledged that the Fourth Amendment permits reasonable searches and seizures under the "community caretaking" exception. *Cady v. Dombrowski*, 413 U.S. 433 (1973). The government bears the burden of demonstrating an exception, including the

community caretaking exception, to the warrant requirement. *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019) (citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)).

The Sixth Circuit has explained the scope of the community caretaking exception to the warrant requirement as follows:

> [C]ommunity caretaking permits only the use of evidence duly discovered in the course of advancing the caretaking function at hand. *See Taylor v. City of Saginaw*, 922 F.3d 328, 335 (6th Cir. 2019). Concerns about the health of a driver by themselves generally do not permit the unannounced opening of a car door. The scope of any search or seizure must reasonably match its function, and concerns about the health of a driver generally do not stand in the way of announcing oneself or otherwise trying to alert the driver before suddenly opening a car door. *Cf. United States v. Lewis*, 869 F.3d 460, 464 (6th Cir. 2017). Only 'when delay is reasonably likely to result in injury or ongoing harm to the community at large' and only when the officer's actions advance that public service will a seizure of evidence be reasonable.

*Morgan*, 71 F.4th at 545.

In *Morgan*, an officer had passed a parked and running car with the driver appearing to be passed out with his head tilted back and then the officer saw the same vehicle with the driver in the same condition about 11 minutes later. The officer suspected that an overdose or intoxication had overcome the driver, so he decided to check on the driver. He parked about 15 feet away, turned on his body camera, did not turn on the police car's flashing lights and reported to dispatch what he was doing. Upon approaching the vehicle, the officer noticed that a civilian stood near by potentially in the path of the vehicle and believed that if the driver was intoxicated or on opiates, the driver might hit the gas if startled by the officer. Therefore, the officer did not knock on the door or shine a light in the car to attempt to arouse the driver, but he just opened the car door. The officer asked the driver for his I.D. and then the driver moved his hand making the officer believe that he might be reaching for a firearm, and so the officer asked the driver to step out of the car. The driver refused and the officer ordered him to put his hands behind his back and told the driver he was arrested. In searching

13

the driver, the officers found bags filled with controlled substances and a firearm.  The indictment followed and a motion to suppress filed by the defendant based upon the community caretaking doctrine to the warrantless search was denied.  The Sixth Circuit reversed the district court's denial of the motion to suppress.

In *Morgan*, the Sixth Circuit found that before opening the driver's door, the officer had not taken "less intrusive paths available to him for addressing his concerns about Morgan." *Morgan*, 71 F.4th at 545.  These "less intrusive paths" identified by the Sixth Circuit included "turning on the police car's emergency lights, shining a flashlight into Morgan's face; calling out to Morgan; or knocking on the window."  *Morgan*, 71 F.4th at 545.  In the instant case, the Court finds that the officers took these very "less intrusive paths."

Officers Green and Deltour parked their vehicles in front of and behind Melton's vehicle, respectively, approximately eight minutes after being advised by Dispatch of a report of a vehicle stopped in the left turn lane with the driver slumped over the wheel and blocking traffic or posing a traffic hazard.  When they arrived at the scene of the incident, the vehicle was still in the left turn lane impeding traffic.  The officers believed that either Melton was having a medical emergency or was operating the vehicle while intoxicated, suspected that the driver could be impaired, and needed to investigate.  They activated their oscillating lights, which were shining into the front and rear windows of Melton's vehicle, but Melton did not awaken.  Officer Green walked to the rear of the car, saw the brake lights were on meaning that the vehicle was in drive, and therefore, he believed that if the driver awakened, he might press the gas pedal and move forward causing a safety concern. Officer Green called in the license plate and learned from dispatch that the registered owner had an outstanding warrant out of Virginia for a probation violation associated with a weapons possession

14

charge.  Officer Green testified that he suspected that the driver was the registered owner of the vehicle.  All three officers knew that the registered owner of the vehicle had an outstanding warrant as they walked towards the vehicle to try and wake up the driver.  Officer Green was at the driver's door and shining his flashlight into the vehicle and Officers Deltour and Ramos were at the passenger side door shining their flashlights into the vehicle for several seconds, Officer Deltour yelled "wake up" but still Melton did not wake up.  It was only after Officer Green tapped on the driver's window that Melton roused from his sleep.

Moreover, whereas in *Morgan* there was no traffic violation, the instant matter involves a traffic infraction, i.e., a violation of O.R.C. § 4511.66 for stopping a vehicle in the left turn lane on a highway for at least eight minutes.  Indeed, upon arrival at the scene, the officers saw the vehicle in the left turn lane at an intersection impeding traffic and they knew a caller had reported to Dispatch that the driver was slumped over the wheel.  Accordingly, the Court finds that the parking of the police cruisers in front of and behind Melton's vehicle constituted a seizure of Melton but that it did not violate the Fourth Amendment because the officers were engaged in a community caretaking function, and they also were eyewitnesses to the driver committing a traffic violation that impeded traffic and caused safety concerns, requiring investigation.

Melton's citation to *United States v. Gross*, 624 F.3d 309 (6th Cir. 2019) (amended and superseded by 662 F.3d 393 (6th Cir. 2011) may support his argument that a police cruiser pulling into a parking lot and stopping his cruiser directly behind a parked vehicle constitutes an investigatory *Terry* stop, but it does not dispel this Court's conclusion that at the time officers pulled behind and in front of his vehicle they were performing a "community caretaking" function and engaged in investigating a traffic violation.  Indeed, in *Gross*, the Sixth Circuit distinguished its conclusion

15

reached in that case from its prior unreported decision in *United States v. Koger*, 152 Fed. Appx. 429, 430-431 (6th Cir. 2005), which did involve officers performing a "community caretaker" function. In *Kroger*, the arresting officer approached a running vehicle that was illegally stopped and partially blocking a local highway; officers observed the driver asleep or unconscious in the driver's seat and knocked on the window; when the driver rolled down the window, the officers noticed the strong odor of marijuana, asked the driver for his driver's license, and a computer check revealed that his license was suspended; and a subsequent consensual search of the vehicle uncovered drugs and a firearm.  The Sixth Circuit affirmed the district court's denial of the defendant's motion to suppress.

Similarly, Melton's citation to *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009) does not change the Court's conclusion.  It is true that in *See* the Sixth Circuit agreed with the district court's conclusion that the blocking of the defendant's car to identify the occupants and maintain the status quo while obtaining information was a warrantless *Terry* seizure. But like *Gross*, it is distinguishable from the instant matter because the case did not involve the officers performing a "community caretaker" function and did not involve a traffic infraction.

However, the next question that the Court must decide based upon Defendant's Motion is whether the opening of Melton's driver's door at the same time Officer Green was asking Melton to step out of his vehicle, and Officer Deltour opening the passenger door, putting the vehicle in park and taking the keys without Melton's consent, violated the Fourth Amendment.  Since the officers did not ask Melton any questions concerning any medical condition he might have been suffering from   to evaluate whether he was impaired by alcohol or drugs or slumped over the wheel because of a medical emergency, the Court finds that the officers' community caretaking function ceased as of the opening of the vehicle doors.  However, the Court finds that the officers were continuing to

16

conduct a traffic stop, evaluate any potential impairment, and investigate whether the driver was the registered owner of the vehicle subject to an arrest warrant at the point in time when Officer Green simultaneously asked Melton to step out of the vehicle and he and Officer Deltour opened the vehicle doors, and Officer Deltour put the vehicle in park, took the keys out of the ignition, and conducted a protective safety sweep of the vehicle with his flashlight.

In *Pennsylvania v. Mimms*, 434 U.S. 106, 111, n. 6  (1977) *(per curiam),* the Supreme Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendmen[t]," because the government's "legitimate and weighty" interest in officer safety outweighs the "*de minimis*" additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle.  Citing *Terry v. Ohio*, 392 U.S. 1 (1968) „ the Court further held that a driver, once outside the stopped vehicle, may be patted down for weapons if the officer reasonably concludes that the driver might be armed and dangerous.  *Mimms,* 434 U.S. at 112.  *See*, *also*, *United States v. Ware*, 465 Fed. Appx. 487, 494 (6th Cir. 2012) ("Once Ware was standing at the driver's door, Det. Staimpel had authority to frisk him for weapons based on the reasonable suspicion that Ware was armed and dangerous.")

Arguably, *Mimms* is distinguishable from the facts of this case because in *Mimms* the officer did not open the door to the vehicle but merely instructed the driver to exit the vehicle.  Here, Officer Green's body camera video demonstrates that he asked Melton to roll down his window, shut the car off, unlock the doors and then he asked Melton to step out of the vehicle at the same time he grabbed the driver's door handle and opened the door.  Officer Green did not give Melton the opportunity to step out of the vehicle or comply with his request before the vehicle doors were opened by the

17

officers.[6] However, to answer the question of whether officers were required to wait to open the vehicle doors until Melton had expressed verbally or by his actions or inaction, a refusal to comply with Officer Green's request to step out of the vehicle, this Court finds the Sixth Circuit's decision in *United States v. Pacheco*, 841 F.3d 384, 388 (6th Circ. 2016) to be instructive.

In *Pacheco*, the Sixth Circuit found that it was permissible for officers to open the door to a vehicle and remove its occupants after the occupants failed to comply with an order to exit the vehicle. In *Pacheco*, before ordering both the driver and the defendant passenger out of the vehicle during a traffic stop based upon officers' direct observations of traffic violations, an officer spoke with the driver who did not have a valid driver's license and appeared nervous; and an officer spoke to Pacheco who did not respond to the officer when asked for his identification, began rummaging through the glove compartment, ruffling papers and was nervous and glancing around the vehicle and then again opened the glove compartment, looked down at the floorboard and over at his leg near the center console and otherwise failed to acknowledge any question from the officer. Pacheco was asked to step out of the vehicle, but he did not comply, and the officer asked a second time and this time the officer opened the door for the passenger.

In *Pacheco*, the Sixth Circuit explained that officers do not need independent justification to remove the driver or passenger from a vehicle "in large part, because traffic stops are 'fraught with danger' for police officers. *Michigan v. Long*, 463 U.S. 1032, 1047, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Thus, after permissibly stopping the Aviator for prior traffic violations, [the officers] were permitted to remove [the driver and passenger] from the SUV."

---

[6] Melton asserts that he did not consent to Officers Green and Deltour opening his vehicle doors, but this Court finds that his consent is not necessary.

One district court in this Circuit has interpreted the foregoing language in *Pacheco* as dicta, but nonetheless concluded as follows:

> Based on *Pacheco* and the reasoning out of circuit cases have stated when they extended *Mimms* and [*Maryland v. Wilson*, 519 U.S. 408, 415 (1997)] to the opening of a car door during a traffic stop, the Court finds that [the officer] could permissibly open the rear door and instruct Davis to exit the vehicle because he had reasonable suspicion that [the defendant] was armed and posed a danger to officers and the public… The Court's conclusion applies the reasoning in *Mimms* that recognized the inherent danger in performing a traffic stop and the legitimate officer safety concerns present."[7]

*United States v. Davis*, 2025 WL 2902246, *4 (E.D. Mich. Aug. 20, 2025).

At the time that Officer Green asked Melton to step out of the car and simultaneously opened the driver's door and Officer Deltour opened the passenger door and then turned off the car and took the keys after Melton did not do so upon request, they were aware of a warrant on a probation violation associated with a weapons charge for the registered owner of the vehicle.  In *Kansas v. Glover*, 589 U.S. 376 (2020)  the Supreme Court held as follows:

> When the officer lacks information negating an inference that the owner is driving the vehicle an investigative traffic stop made after running a vehicle's license plate and learning that the registered owner's driver's license has been revoked is reasonable under the Fourth Amendment.
>
> (a) An officer may initiate a brief investigative traffic stop when he has "a particularized and objective basis" to suspect legal wrongdoing.  [Citation omitted.] The level of suspicion required is less than that necessary for probable cause and "depends on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  [Citation omitted.]  Courts must therefore permit officers to make 'commonsense judgments and inferences about human behavior."  [Citation omitted.]
>
> (b)  Here, the deputy's commonsense inference that the owner of a vehicle was likely the vehicle's driver provided more than reasonable suspicion to initiate the stop.  That inference is not made unreasonable merely because a vehicle's driver is not always its

---

[7] The "reasonable suspicion" that the officers had was based upon the back seat passenger, Davis, stuffing something down his pants and the officers believed it was contraband or a weapon.

19

registered owner or because Grover had a revoked license.  ***[C]ommon sense suffices to justify the officer's inference….

*Kansas v. Glover*, 589 U.S. 376  at *Syllabus*.

Just as the Supreme Court in *Glover* held that the officer's "commonsense inference that the owner of a vehicle was likely the vehicle's driver" so as to provide reasonable suspicion to stop the vehicle, this Court finds that Officer Green's suspicion or "commonsense inference" that the owner of the vehicle, Jesse Melton, was the driver at the time of the incident who had a warrant for a probation violation associated with a weapons charge was reasonable and gave the officers reason to be concerned for their safety.  Accordingly, the officers had reasonable suspicion to investigate further by opening the doors of the vehicle at the same time Officer Green asked Melton to step out of the vehicle.  Indeed, the officers were justified in having a reasonable suspicion that the driver, Melton, was the subject of the warrant and could be armed and dangerous and therefore, they needed to continue to investigate his identity to determine if the driver and registered owner were one and the same.  They also needed to investigate any potential impairment of the driver.  And that is just what the evidence demonstrates they did.  They had the opportunity to observe Melton, and asked him how he was doing, whether he had any medical conditions (he asserted he had high blood pressure but was just tired), where he had been, and where he was going.  Indeed, it was within several seconds of Melton exiting the vehicle that Melton was asked his name and social security number and then Officer Deltour went directly to his vehicle, provided that information to Dispatch to confirm the warrant, and the warrant was confirmed.

Accordingly, the Court concludes that Melton's Fourth Amendment rights were not violated.

**The decision to tow Melton's vehicle was consistent with the Policy
and the inventory search did not violate the Fourth Amendment**

20

Finally, the Court rejects Melton's final arguments that Officer Deltour's decision to tow Melton's vehicle and the commencement of the search of his vehicle before completion of the inventory sheet demonstrates pretext for the search of his vehicle, requiring the gun and drugs to be suppressed.

Police can mandatorily tow and impound a suspect's vehicle if the department's towing policy clearly allows them to do so under the circumstances of the case. *See United States v. Joyner*, 2015 U.S. Dist. LEXIS 161911, *11 (M.D. Fla. Dec. 2, 2015). Police can tow and impound vehicles that "jeopardize the public safety and the efficient movement of vehicular traffic." *United States v. Duguay*, 93 F.3d 346, 352 (7th Cir. 1996) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 368-69 (1976)). Police do not have to allow a driver to make alternative arrangements instead of impounding the vehicle. *See Colorado v. Bertine*, 479 U.S. 367, 373-74 (1987); *Sammons v. Taylor*, 967 F.2d 1533, 1540-43 (11th Cir. 1992).

The Policy of the Euclid Police Department allowed its officers to mandatorily tow and impound Melton's vehicle under the circumstances of the case. Under the Policy, "a vehicle **shall** be towed if it would present a traffic hazard." (Gov.'s Ex. 2) (emphasis added). Officers Green and Deltour testified, and this Court concludes that Melton's vehicle was presenting a traffic hazard. As the Government correctly points out, although the Policy does not define the word "shall", this Court can use or apply its plain and ordinary meaning, which is "must" or "obliged to." Websters Third International Dictionary (1976). The Policy does include "examples of situations where consideration should be given to leaving a vehicle at the scene in lieu of towing, provided the vehicle can be lawfully parked and left in a reasonably secured and safe condition[.]" However, the evidence

demonstrates that with no other driver present at the scene, an officer would have had to leave his cruiser to move Melton's vehicle.

The Court finds that Officer Deltour followed the Policy in deciding to tow the vehicle. It is of no consequence that he did not offer Melton the opportunity to have someone come and remove the vehicle; and Melton never asked about any alternatives to the tow. Officer Deltour testified that only rarely has he allowed a third party to come to the scene and move the vehicle when it is blocking traffic, and only when the third party was able to arrive in five to ten minutes. However, he could not remember the exact circumstances associated with any such rare occasion. Moreover, Melton has not offered any evidence that there was even the possibility of having someone come to the scene within five to ten minutes.

"A warrantless inventory search may only be conducted if police have lawfully taken custody of a vehicle" *United States v. Smith*, 510 F.3d 641, 651 (6th Cir. 2007) (cleaned up). One example includes vehicle impoundment by police. *See United States v. Jackson*, 682 F.3d 448, 455 (6th Cir. 2012) ("police may conduct an inventory search of an automobile that is being impounded without running afoul of the Fourth Amendment").

It was only after Officer Deltour confirmed the warrant and ordered the tow, that the warrantless inventory search of Melton's vehicle began and therefore, it did not run afoul of the Fourth Amendment. The fact that the search began and was conducted and then the inventory was prepared and ultimately completed during the same time frame is of no consequence. The key is that the search began only after the warrant was confirmed and the decision was made – consistent with the Policy – to tow Melton's vehicle. Therefore, the warrantless search of Melton's vehicle that

resulted in finding the gun and drugs that are the subject of the Indictment did not violate Melton's Fourth Amendment rights.

For the reasons set forth above, Defendant's Motion is DENIED.

**IT IS SO  ORDERED.**


           s/Pamela A. Barker
           PAMELA A. BARKER

Date:  May 8,, 2026           U. S. DISTRICT JUDGE